Martin Hucko, Appellee, v. Morris Adler et al., Appellants.

Gen. No. 15,079.

1. Master and servant—*when former liable for injury suffered by servant while engaged in loading cars upon railroad tracks.* A servant engaged in work who is so placed by the master as not to be in a position to watch for and guard against switching movements affecting the car or cars upon which he is working is entitled to recover if his injury results from a failure of the master to give him due warning of such movements; and, under such conditions, the master is not absolved from his obligation to warn by a like obligation existing on the part of the railroad company actually making such movements.

2. Negligence—*anticipation of.* Under the law no one is required to anticipate that another will be negligent.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. Robert W. Wright, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1908. Affirmed. Opinion filed October 21, 1910. Certiorari denied by Supreme Court (making opinion final).

H. B. Bale and Morse Ives, for appellants.

Francis X. Busch and Frank A. Rockhold, for appellee.

Mr. Justice Chytraus delivered the opinion of the court.

In this suit, brought by Hucko against Adler & Oberndorf, copartners, and the Chicago Junction Railway Compan, a corporation, for personal injuries claimed to have been sustained by the plaintiff through the negligence of these defendants, a judgment was recovered in the Superior Court against Adler & Oberndorf for $2,850. The jury returned a verdict of not guilty as to the Railway Company.

Adler & Oberndorf are prosecuting this appeal. When he was injured plaintiff was at work for the judgment defendants and they were consequently chargeable with the duties and obligations to him, as their servant, which under the law, arise out of the relation of master and servant.

In connection with their establishment at the Stock Yards, in Chicago, the judgment defendants have a switch track, estimated to be from 150 to 300 feet long, which runs into their plant from a main track of the Chicago Junction Railroad Company. The switch track extends north and south, lies on the east side of a platform which is on the east side of their plant and is used to load and unload cars, connects with the main track north and toward the east of the plant by a switch and it terminates just south of the platform. The platform is about four feet high, about half a block long and about twenty feet wide. When a freight car stands upon the track beside the platform there is a space of about six inches between the car and the platform, and the floor of the car is then about six inches higher than the surface of the platform. The north part of the switch track curves eastward before connecting with the main track.

Upon orders from Adler & Oberndorf to a switching crew of the Chicago Junction Railway Company engaged in that vicinity, where there are other business plants and other switching tracks, which orders were usually given by a foreman of Adler & Oberndorf, Novotney, and sometimes by one of their clerks, Bell, the Railway Company switched cars upon this switch track and in front of this platform, to suit the purposes of Adler & Oberndorf. The locomotive used for the switching was equipped with an automatic bell which always rang when the locomotive was in motion. Owing to the difference in the levels between the floors of the freight cars and the platform an iron plate about an inch in thickness and about three feet square was frequently, when cars were loaded or unloaded, so placed that barrels could be rolled thereupon from the car to the platform and from the platform to the car. The iron plate was placed and removed and cars were loaded and unloaded by workmen according

to the direction of Novotney, the foreman. The plaintiff was one of these workmen. On May 10, 1906, plaintiff had been in the employ of Adler & Oberndorf about two months and about 9 or 10 o'clock in the morning of that day he was aiding in loading with barrels of grease and tallow a freight car standing in front of the platform. Four barrels had been taken into the car without the use of the iron plate when Novotney directed plaintiff and another workman to put the plate down and use that. This the workmen did. Immediately after the iron plate had been placed and as these two workmen were about to take the fifth barrel into the car plaintiff happened to be standing just south of the iron plate when a switch engine or locomotive so moved upon the switch track a car or cars that the same bumped into the car which was being loaded. The effect was that the iron plate was quickly shoved southward against plaintiff's left leg which then came between the edge of the plate and a barrel standing on the platform immediately to the south. The leg was severely cut and injured and lockjaw set in whereby plaintiff was laid up for several months.

Adler & Oberndorf, the appellants, contend that negligence of the Railway Company was the proximate cause of the injury plaintiff sustained and that the master cannot be held to anticipate the negligence of third persons, notwithstanding that he is obliged to furnish his servants a safe place in which to perform their services to him. This contention makes important a consideration of the facts and circumstances, as between Adler & Oberndorf and the Railway Company, relative to the switching generally and as to the switching on the occasion when plaintiff was injured in particular. The Railway Company switched cars for Adler & Oberndorf into, from and upon this switch track nearly every day, sometimes three or four times a day, and generally in the morning. Each time switching was desired a request was made, as already stated, by Novotney or Bell. Usually when a request was made the locomotive was busy elsewhere and would not ordinarily come immediately upon request. Sometimes the locomotive would not come until

an hour or even until several hours had elapsed after the request. Whenever the locomotive came upon this switch track it was always for the purposes of appellants and at their special request. It was a custom that when the locomotive came to do switching upon this switch track the bell thereof would ring, which would serve as a notice and warning to appellants. It appears from the plaintiff's evidence that always before the time when plaintiff was injured some one connected with the switching crew would also call out and the locomotive whistle would "blow" when the locomotive came and that thereupon either Novotney, Herman Ludwig, who was an inspector for appellants, or Bell would warn the workmen, direct them to take up the iron plate and set them to work where they would be in no danger, but that on the occasion in question there was no warning of any kind either by the Railway Company or by appellants. As to the sounding of the whistle, however, we think the greater weight of the evidence is, clearly, that it was not sounded except in case of emergency. There was evidence introduced on behalf of the Railway Company that some one of the switching crew called out a warning, as usual, to Bell, Novotney or some one on the platform and that not only was the bell of the locomotive ringing automatically but that the fireman had hold of the bell rope and aided in the ringing as the locomotive came in upon the switching track and before there was any attempt at coupling or any bumping against the cars. On behalf of appellants evidence was introduced which tended to show that no one representing appellants was on the platform when the locomotive came to do the switching. This is a question of fact which was in controversy.

Novotney testified that, previous to the accident, when the switching crew and the locomotive approached he would call the workmen out of the cars, have them take the iron plates away and, if there was anything in the cars liable to roll out, have the car door shut before he would allow any switching. While the switching was being done, which would last about ten or fifteen minutes, the workmen would

be set at work somewhere out of the way of danger. When he expected "a switch" Novotney listened to the locomotive when it was up at "the crossing" and looked over to ascertain whether it was coming or not. When in the car he would wait until one of the switching crew called him and then as put by him, "I wouldn't go by the engine at all, I would wait until Shaw or Higgins [of the switching crew] would call me." On the morning of the accident, at about half past seven o'clock, he, himself, hunted up the switching crew and told Higgins what switching he desired and was promised that it would be attended to in a short time. Shortly after eight o'clock, that is about an hour before the accident, as the switching crew had not come, he sent Bell to· again request that the desired switching be done. Bell testified that as they were in a hurry for the switching to be done he was sent to look up the switching crew after Novotney had given the order. Bell also testified that when he did go to see the switching crew he spoke to Higgins and that then it must have been nine or half past nine o'clock. He told Higgins that they "wanted a switch made" and that they wanted it right away. Higgins testified that the switching was done in about five minutes after this order was given. Novotney further testified that at the time of the accident he had about seven men under his immediate control; that after he had sent Bell for the switching crew he continued to work around the cars and was "expecting the switch;" that he did not know how soon the switching crew would come; that Bell did not come back to him; that he sent Bell about an hour before the accident occurred; that when the accident happened he was inside of the car and must have been there about ten minutes; that he did not hear the bell ring and that the first he knew of the switching crew and the locomotive being there was when the car he was in was bumped into; that he relied upon some one from the Railway Company coming and informing him that the switching would be made before it was made; that, as stated by him, "I was figuring on them to let me know before they would come in" and that he would have plenty of time to warn the

workmen. It appears from the evidence that the switching was completed and the switching crew were leaving the switch track when they first learned that any one had been injured. It also appears that there were five cars standing in front of the loading platform at the time in question, only one of which was south of the car being loaded, and that some of these were not coupled together but stood some little distance apart. Both ends of the platform were covered with barrels and they came close up to the cars. At the north end of the platform the space between the barrels and the cars was from two to four feet and in some places the barrels stood two tiers high.

At the time he was injured, so far as this record shows, plaintiff stood in a proper place for the performance of his services to appellants, his masters. He, with others, was there busily engaged and more or less engrossed in the work of loading cars, under the direction of Novotney as vice principal. It is a rule of law so familiar to the profession as to render the citation of authority unnecessary that it is the duty of the master to exercise reasonable care to furnish a reasonably safe place for the servant to do his work. This rule requires the master to exercise reasonable care to continuously keep the place where the servant is at work reasonably safe. The jury evidently arrived at the conclusion, and the conclusion is in perfect harmony with our views, that Novotney failed to exercise reasonable care to prevent the accident to Hucko. And the negligence of Novotney was the negligence of Adler & Oberndorf. Although Novotney was urging the switching crew to come with the locomotive and switch one or more of the cars upon this switch track and did not know how soon the crew would come but was expecting the switching to be done at any moment, he went inside of the car and remained there for ten minutes, according to his own statement, without keeping a look-out for the expected switching crew to which he had given the directions for switching, which was certain to come and which was liable to come at any moment. His own statements regarding what he had done when switchings had

been made previously indicated that danger in various forms was to be apprehended to the workmen under him loading cars when switchings were made, that he realized the possibility of injury to them and that he also realized the necessity for exercising some care.  The principal defense advanced is that the Railway Company was negligent in failing to announce in any way the coming of the crew and locomotive before proceeding to do the switching.  Suppose we assume for a moment that the Railway Company did owe a duty to plaintiff such that ordinary care on its part required that it should warn him before proceeding with the switching and suppose, further, that it failed to give any warning, which we do not wish to be understood as finding, how can that avail Adler & Oberndorf?  They owed a duty to plaintiff independent of any duty the Railway Company owed him.  They owed a duty to him to exercise reasonable care to keep the place where they kept him at work reasonably safe.  We think, as did the jury, that they failed in that respect. While ordinarily under the law, no one is obliged to anticipate negligence in another (Hickey v. Chicago City Ry. Co., 148 Ill. App. 197, 221) nevertheless under the circumstances of this case, were negligence of the Railway Company, as Adler & Oberndorf contend, a cause of plaintiff's being injured yet Adler & Oberndorf would not be relieved from liability. They were under a positive and affirmative duty to exercise reasonable care to see that plaintiff was not injured, while at the place where he was injured, by any cause which they could reasonably foresee and prevent.  We think it clear that they could and should have foreseen the possibility of and guarded plaintiff against the injury he sustained.  The judgment defendants owed plaintiff the duty to protect him from injury by the bumping of a car against the car he was in, while he was loading it, by reason of the switching they were urging and expecting to be done immediately.  The best that could be said for Adler & Oberndorf, if their contention that the Railway Company was negligent were correct, would be that their negligence and negligence by the Railway Company concurred in bringing about the

injury the plaintiff sustained; but we are inclined to the opinion that the Railway Company gave warning at least by the ringing of the bell of the locomotive. Adler & Oberndorf could not discharge their positive and affirmative duty to Hucko by merely relying upon the Railway Company letting them know that the switching was about to be done in time sufficient for Novotney to warn the workmen. If a master delegates or depends upon another in respect to the discharge of his duty to furnish his servant a reasonably safe place in which to do his work he does so at his own hazard not at the servant's. If, in such case, there be a failure the master must respond to the servant for any injury that he may sustain. Furthermore, it may well be said that when Novotney determined to depend upon the agency of the switching crew, to prevent injury to the workmen under him, he adopted them as his agents and the agents of Adler & Oberndorf for that purpose and their negligence, if any, would be Adler & Oberndorf's negligence.

We see no merit in the proposition advanced by appellants that "The plaintiff cannot recover on testimony which makes his own case false." In the argument in support of that proposition appellants pick out of the declaration certain averments, which relate more especially to the Railway Company, to the effect that the Company "without warning" switched, etc. In this connection the appellants then say: "The plaintiff cannot now be heard to say that the Railway Company did give its usual warning and that his injury occurred by reason of a failure on the part of appellants to rewarn." In the first place it is sufficient to say that in advancing this contention and argument appellants ignore the averments of the declaration with reference to appellants. It was not necessary for plaintiff to prove a case against both the Railway Company and Adler & Oberndorf. In the next place, so far as liability on the part of Adler & Oberndorf is concerned, it is immaterial whether the Railway Company switched with or without giving warning. It is even immaterial that the evidence upon which the judgment is predicated contradicts the averments of the plaintiff's declaration

in part, so long as the legal theory of the evidence upon which the judgment is predicated is not variant from the legal theory of the count upon which recovery is had. The appellant's argument does not take up the counts and even attempt to argue such variance as to the several counts.

The evidence discloses no contributory negligence on the part of the plaintiff. His view as to what was being done with reference to switching was shut off by barrels upon the north end of the platform and was cut off by the curve in the switch track. There is no evidence tending to indicate that he could know whether the locomotive was upon the main track, upon some switching track other than the one in question, upon the one in question or elsewhere even if he heard the bell of the locomotive while engaged in the work he was doing for appellants.

What has been already said presents sufficient reasons for the refusal of the instruction which is complained of by appellants.

The judgment of the Superior Court is affirmed.

*Affirmed.*